PRESCOTT & NORTHWESTERN RAILWAY COMPANY *v.* DAVIS.

## Opinion delivered October 30, 1916.

1. BILLS OF LADING—TITLE TO SHIPMENT OF FREIGHT.—The purchaser of the bills of lading who has accepted a delivery thereof and paid for the same, becomes the owner of the shipment of freight.

2. BILLS OF LADING—CONSTRUCTION.—Bills of lading, insofar as they are receipts, may be explained or contradicted, but as contracts for the carriage of property, they are to be construed according to their terms.

3. CARRIERS—RIGHTS OF PURCHASER OF BILL OF LADING.—The purchaser of a bill of lading may rely upon the representations of the carrier made therein, and the carrier will be liable to him for damages resulting from a violation of its terms.

4. CARRIERS—TERMS OF SHIPMENT—BILL OF LADING.—It will be presumed that any oral negotiations respecting the terms or conditions upon which goods are received for carriage, the route and rate at which they are to be forwarded, are merged in the bill of lading.

5. CARRIERS—DAMAGE TO FREIGHT.—A carrier will be liable for damages to freight, in an action by the *bona fide* purchaser of the bill of lading, where the goods were not routed as specified in the bill of lading, and the damage was the result of such mis-routing.

Appeal from Nevada Circuit Court; *George R. Haynie*, Judge; affirmed.

### STATEMENT BY THE COURT.

S. P. Davis brought suit for damages, for the total loss of two carloads of strawberries, alleged to have been caused by delay in transportation and delivery.

The complaint alleges that the railroad company issued two negotiable bills of lading, one for each carload of strawberries, on about the 8th of May, 1913, agreeing therein to ship from Prescott, Arkansas, via East St. Louis over the Mo. Pac. R. R. to Buffalo, N. Y., in which bills it appeared that the berries were originally consigned to G. L. Mays, Kansas City, but had been diverted from Kansas City; that at the time of the issuance of the bills the shipments had not in fact been diverted from Kansas City, but had been deviated from the route specified in the bill of lading and trans-

ported to Kansas City, 500 miles out of the way from said route. That on the 9th day of May he purchased the bills of lading, in good faith, which were assigned and sent to him in the usual course of business and in reliance upon the representations made therein, that the cars had been diverted from Kansas City and were in transit by the usual route from Prescott, Ark., to Buffalo, N. Y., as specified, and thereby he became the owner of the carloads of berries. That by reason of their shipment out of the way by Kansas City, they were delayed 48 hours and reached the market in Buffalo in a damaged and decayed condition, or absolutely worthless, and that because of the negligence and misconduct, he was damaged in the sum of $1,800.

The answer admitted that the shipment originated on its line; arrived at Prescott on the afternoon of the 8th of May, when the shipper, G. L. Mays ordered the cars consigned to G. L. Mays, Kansas City, Mo., and they were so waybilled, no bills of lading being issued on that day, according to its custom. On the 9th, instructions were given to divert the cars and ship to Geo. DeLong & Co., Buffalo, N. Y., and upon receiving said instructions, appellant ascertained that the cars had passed through Little Rock, Ark., on their way to Kansas City, advised the shipper of that fact and issued the bills of lading at the shippers request, noting on each, "Originally consigned to G. L. Mays, Kansas City, Mo. Diverted from Kansas City;" meaning thereby that said cars would upon arrival at Kansas City be diverted to Buffalo, N. Y. Alleged that the shipper received the bills of lading, knew that the cars had already passed Little Rock, and that they were ordered diverted from Kansas City and would first go to that place before being diverted.

The answer denies the bills of lading were negotiable; that the berries were deviated from the route mentioned therein and sent 500 miles out of the way; that the plaintiff purchased the bills of lading on the 9th of May in good faith, paying value therefor and that he purchased same in reliance upon the represen-

tations of the bills; denied that the bills represented that the cars had been diverted from Kansas City, and were in transit by the usual course and customary route from Prescott via East St. Louis, to Buffalo, N. Y. Alleged that the company complied with the request and instructions of the shipper and that the bills of lading gave appellee notice that the cars would be diverted from Kansas City. Denied any damage to the shipment, that the berries were originally worth $1,800, and alleged that if any damage resulted, it was caused by reason of the berries being unfit for shipment and the negligent manner in which they were packed.

It appears from the testimony that appellee, a broker, purchased the two cars of berries on the 9th of May between 9 and 11 o'clock, through his clerk in the office, over the 'phone from Mays at Morrilton. Mays said he had two cars of berries at Prescott that were billed to Kansas City, but he could have them diverted, and was told that if he could have them diverted and shipped on the direct route from Prescott over the Mo. Pac. through East St. Louis to Buffalo, that he would purchase same and the trade was made upon Mays stating that this would be done. The next day, the 10th, the bills of lading were delivered to appellant, showing the notations set out in the complaint and "date of May 8, 1913, 449 crates of strawberries consigned to the order of G. L. Mays, Buffalo, N. Y. Notify Geo. DeLong & Co., Buffalo, N. Y. Route Prescott, Mo. Pac. East St. Louis, Lake Shore delivery." They are signed by the shipper. On the back among other provisions, the following: "The amount of any loss or damage for which any carrier is liable shall be computed on the basis of the value of the property (being the *bona fide* invoice price, if any, to the consignee, including the freight charges, if prepaid) at the place and time of shipment under this bill of lading, unless a lower value has been represented in writing by the shipper, etc."

A check was given in payment and drafts were forwarded to Buffalo with the bills of lading attached.

Appellant went to Buffalo and inspected the berries which had been sold for $2 per crate and found them decayed and worthless, the purchaser refusing to receive them at all.   They arrived two days late, having been shipped around by Kansas City, 500 miles from the direct route designated in the bills.   He stated also that if the berries had been marketable, he would have received $855.80 net for each car.

He had no notice when he paid for the berries that the cars were going via Kansas City.   The bills were endorsed to him by Mays, the shipper.

The agent for the railroad testified that he made out the bills of lading, about noon on May 9.   That the order to divert the cars was given at the hotel at noon by an agent of Mr. Mays, on the receipt of which he called the Iron Mountain at Little Rock after first telling Mays' agent he expected the cars had already passed that point, and found that they had passed Little Rock about 11 o'clock.   The cars were shipped on a way bill issued on the 8th; the bills of lading were issued about 3 o'clock on the afternoon of the 9th, and Stone, the agent who signed the bills for the shipper Mays, had learned that the cars had already passed Little Rock. Witness said after he learned they had passed Little Rock, he issued the bills of lading with the endorsement already set out, "To show that the cars were moving by indirect route and by way of Kansas City."   Stated the direct route was as shown by the bills of lading through East St. Louis, and not by Kansas City.   He stated his said notation on the bill of lading meant that they were to be diverted from Kansas City after reaching there.   He had never issued any bills of lading through to Kansas City before.   Said he told the shipper after trying to give him the benefit of the direct route, that they had already moved to Kansas City and were afterward to be diverted from that point   as they could not catch them after they left Little Rock.

The chief clerk of the traffic department of the Iron Mountain railroad, stated that the shipment of berries originating in Prescott routed via East St. Louis, Big

Four, Lake Shore delivery would take a through rate, and that there was no traffic agreement between appellant railroad and the roads in Kansas City, by which a car could be billed from Prescott via Kansas City via East St. Louis to Buffalo on the through rate. The diversion point of the shipment originating at Prescott going to Kansas City is Little Rock and if it had passed that point, it would be reconsigned out of Kansas City. Stated he would not understand from the notation on the bill as to the shipments being diverted from Kansas City, that they were ever to go there, but had been diverted or would be and take the regular route.

The court directed the jury to find a verdict for the plaintiff and assess the damages from the testimony, allowing 6 per cent interest thereon from the 14th of May, over the objections of appellant.

The jury returned and stated they had not reached a verdict and the court told them they were to find for the plaintiff the sum of $1,711.60. A member of the jury stated this would not be satisfactory to all the members and thereupon the court directed the jury to return a verdict for that amount, which was done, and from the judgment thereon this appeal is prosecuted.

*McRae & Tompkins*, for appellant.

1. The Arkansas statute on bills of lading does not change the common law. The statute making bills of lading negotiable does not clothe them with the attributes of notes or bills of exchange in the sense that they pass title by endorsement without inquiry, as in the case of a note negotiated before maturity, but the purchaser takes title by endorsement of such bill of lading subject to any defense which can be made against the shipper. Kirby's Digest, §§ 524, 528, 529; 101 U. S. 565; 80 Ark. 601-8; Hutchinson on Carriers, § 176; Daniel on Negotiable Instruments (4 ed.), § 1748; 130 U. S. 423; 55 Ark. 525; 6 L. R. A. (N. S.) 302.

2. State statutes affecting interstate bills of lading are superseded or suspended by the Carmack Amendment to the Interstate Commerce Law. 77

Ark. 482, 490; 227 U. S. 657; 233 U. S. 97; 108 Ark. 115; 115 Ark. 20; 4 R. C. L., § 267; 6 L. R. A. (N. S.) 302.

3.   The endorsement on the bills of lading put the purchaser on notice that the cars were not taking the direct route.   101 U. S. 557; 4 Elliott on Railroads, § 1429; 99 Ala. 416; 78 Am. Dec., § 334; 19 Fed 123. It was a jury question as to whether the appellee was a *bona fide* purchaser under all the evidence.   The endorsement on the bill of lading was ambiguous—railroad men themselves, as appears in the testimony, differed as to its construction.   81 Ark. 337; 4 R. C. L., § 26.

4.   The court erred in its instruction on the measure of damages.   This being an interstate shipment, the rules of law announced by the Federal courts must control.   Clause 6 in the bill of lading (quoted in the opinion) is binding.   112 U. S. 331; 4 R. C. L., § 248; 40 L. R. A. 350; 70 U. S. 107; 194 U. S. 427; 139 Fed. 127; 204 U. S. 505.   If the stipulations on the bill of lading referring to the value of the property was valid, the court erred in deciding that the price at Buffalo was the measure of damages, and there was no evidence by which the court or jury could determine the damages because appellee failed to prove what the price at the point of shipment was.

5.   The appellant was not estopped from showing the actual agreement with the shipper.   177 U. S. 665; 105 U. S. 7; 6 L. R. A. (N. S.) 302; 130 U. S. 416.

*Mehaffy, Reid & Mehaffy,* for appellee.

1.   We do not insist that bills of lading are strictly negotiable in the ordinary sense, as bills of exchange or promissory notes, but they are under many restrictions growing out of the nature of the contract and the long usage and demands of commerce from which ordinary contracts are free.   One of their common uses of which the courts take notice is that they may be used through banks to obtain advances and credits.   33 S. E. 821, 823.

Bills of lading insofar as they are receipts, may be explained or contradicted; but as contracts they must be construed according to their terms.    32 Ark. 669; 41 N. E. 480; 36 N. E. 624; 68 S. E. 617; 4 Elliott on Railroads, § 1423; 93 Ark. 545.

There is no uncertainty nor ambiguity in the terms as to the route the shipment was to take.    The notation on the bill of lading purports to deal only with the *route*, and not with the destination.    The carrier writes the bill, and its terms can not be varied or modified by parol testimony.    61 S. E. 298; 25 N. W. 761; 21 N. E. 341; 14 Wall. 579.

Previous contracts between the shipper and the carrier relating to the shipment of freight will be deemed to be merged in the bill of lading.    93 Ark. 537; 215 Fed. 88.

Bills of lading are to be construed more strictly against the carrier.    4 Elliott, § 1424; 142 Fed. 669.

2.    There was no error in the court's holding as to the measure of damages.    The bill of lading provided that the measure should be based upon the *bona fide* invoice price of berries at the point of shipment.    The testimony shows that the berries *were sold f. o. b. Prescott*, point of shipment, and that this was the market price at Buffalo.

The stipulation referred to in the bill of lading is valid only when fair and reasonable and based upon a consideration.    94 Ark. 105; 115 Ark. 20.

Appellant did not, by requested instruction or otherwise, indicate to the court any particular reason why the amount of the verdict was not correctly calculated or based upon the evidence.    33 Ark. 707; 39 Ark. 17; 39 Ark. 337; 93 Ark. 589; 126 S. W. 99; 98 S. W. 366; 80 Ark. 587; 153 S. W. 1111; 106 Ark. 315.

KIRBY, J., (after stating the facts).    The facts of this case are virtually undisputed.    The cars of berries were started from Prescott on the night of the 8th of May, no bills of lading being issued therefor until the afternoon of the 9th, when it was known to appellant

and the shipper that the cars had already passed Little Rock, the diversion point, and the shipper signed the bills of lading as written.

Appellee knew the cars had been billed from Prescott to Kansas City on the 8th; did not see the bill of lading until the 10th when he paid for the berries, and when he received the bills and inquired of the shipper as to the location of the cars he was advised they had gone straight on through Little Rock.

(1)   The bills of lading were negotiable and were transferred and delivered to appellee upon his payment of value therefor and he thereby became the owner of the shipment. *Martin* v. *Railway Company*, 55 Ark. 525.

(2)   Such bills insofar as they are receipts may be explained or contradicted but as contracts for carriage of property, they are to be construed according to their terms. *Western A. & R. Co.* v. *Ohio Valley Bkg. & Tr. Co.* (Ga.), 33 S. E. 821; *Little Rock & etc. Rd. Co.* v. *Hall*, 32 Ark. 669; *Cleveland, C. C. & St. Louis L. R. Ry.* v. *Moline Plow Co.*, 41 N. E. 480; *Merchants Dispatch Transp. Co.* v. *Furthmann*, 36 N. E. 624.

(3)   The carrier knew when the bills of lading were issued that they were negotiable and could be used to obtain advances on the shipment by attaching drafts thereto and discounting them with some bank, which would forward for delivery upon payment of such draft.   These bills contain nothing that would put the purchaser on notice that the shipment would not take the usual route as designated therein, the notation made thereon by the carrier's agent indicating that notwithstanding the shipment had been originally made to Kansas City, it had been diverted therefrom, and the purchaser understood that such was the case and had the right to rely upon the terms of the written contract of carriage or bill of lading, in making his purchase. *Western & A. R. Co.* v. *Ohio Valley Bkg. & Tr. Co.*, supra.

(4)   It w'll be presumed that any oral negotiations respecting the terms or conditions upon which the goods are to be received, the route and rate at which they are

to be forwarded, are merged in the bill of lading. 4 Elliott on Railroads, § 1423; *St. L., I. M. & S. Ry. Co.* v. *Jones*, 93 Ark. 545.

The evidence is undisputed as to the damage and no clause of the bill of lading providing for a different rule of computation was set up at the trial, nor urged as an objection to the measure of damages as assessed. There was no testimony showing the rate charged for the transportation of the shipment nor that the shipper had any other option than to ship under the terms of the contract as made, and at the rate charged.

We do not therefore see that any question can now be made that the damages were erroneously assessed upon a different basis than provided for in the contract of carriage of an interstate shipment. *St. L., I. M. & Sou. Ry. Co.* v. *Cumbie*, 101 Ark. 179; *K. C. P. & G. Rd. Co.* v. *Pace*, 69 Ark. 256.

The judgment is accordingly affirmed.

HART, J. (On rehearing.) Counsel for appellant ask for a rehearing upon the authority of *Atchison, Topeka & Santa Fe Ry. Co.* v. *Harold*, 241 U. S. 371.

(5) In that case the Supreme Court of Kansas held that the bill of lading was an intrastate bill, and that under the State laws an innocent holder of a bill of lading was invested with certain rights not available to the shipper. The court there held that the bill of lading in question was an intrastate bill of lading, and its decision was therefore based wholly on the State statute in regard to innocent purchasers of bills of lading, and entirely ignored the general commercial law on the subject as laid down by the Supreme Court of the United States. The latter court held that the shipment was an interstate one, and therefore governed by decisions of the Supreme Court of the United States. This court, in the case of *Kansas City & Memphis Railway Company* v. *Oakley*, 115 Ark. 20, and other decisions recognized that we are controlled by decisions of the Supreme Court of the United States in regard to

interstate commerce bills of lading. The negotiable character of an interstate bill of lading is discussed in *Pollard* v. *Vinton*, 105 U. S. page 7, and the rule there stated has since been followed by the Supreme Court of the United States. In that case the court said:

"A bill of lading is an instrument well known in commercial transactions, and its character and effect have been defined by judicial decisions. In the hands of the holder it is evidence of ownership, special or general, of the property mentioned in it, and of the right to receive said property at the place of delivery. Notwithstanding it is designed to pass from hand to hand, with or without indorsement, and it is efficacious for its ordinary purposes in the hands of the holder, it is not a negotiable instrument or obligation in the sense that a bill of exchange or a promissory note is. Its transfer does not preclude, as in those cases, all inquiry into the transaction in which it originated, because it has come into hands of persons who have innocently paid value for it. The doctrine of *bona fide* purchasers only applies to it in a limited sense. It is an instrument of a two-fold character. It is at once a receipt and a contract. In the former character it is an acknowledgment of the receipt of property on board his vessel by the owner of the vessel. In the latter it is a contract to carry safely and deliver. The receipt of the goods lies at the foundation of the contract to carry and deliver. If no goods are actually received, there can be no valid contract to carry or to deliver."

This court also recognized this rule in the case of *Martin* v. *Railway Company*, 55 Ark. 510, and other cases. In that case following the decisions of the Supreme Court of the United States, the court, in effect, held that where a transportation company shows that merchandise was not actually received by it and that a bill of lading has been issued by its agent, either through fraud or mistake that, as the receipt of the goods lies at the foundation of the contract to carry and deliver, there can be no such contract unless the goods have actually been received; and that an agent

of the carrier has no authority to issue a bill of lading without actual receipt of the goods, and can not bind the carrier, even as to an innocent holder of the bill of lading.  A careful reading of the decision in the case of *Railway Company* v. *Harold, supra,* will show that the Supreme Court of the United States has not in any way departed from the rule announced in its earlier cases. We have not set out the facts in that case because they have no application whatever to the facts of the case at bar.  In the instant case the undisputed evidence shows that the strawberries were received by the carrier from the shipper, and that they were in good condition when delivered to the carrier.  The uncontradicted evidence shows that the station agent had the authority to issue the bill of lading changing the destination of the strawberries.  The berries were originally consigned to the shipper at Kansas City, but he had the right to have them diverted.  The agent of the railroad company issued a bill of lading consigning them to Buffalo, New York, by the direct route through East St. Louis.  The agent had authority to issue this bill of lading changing the route and destination of the berries, and it is not even claimed by the railroad company that he did not have such authority.  Therefore, the railroad company is bound by the terms of the bill of lading issued by it.  Because the undisputed evidence shows that the agent had authority to issue the bill of lading in question the court did not err in directing a verdict against the railroad company.  It is true that railroad companies are not dealers in bills of lading and are carriers only; but they are held to rigid responsibility as carriers.  As we have just stated, the agent had authority to issue the bill of lading in question, and the railroad company is bound by its terms.

It follows that the motion for a rehearing must be denied.